OPINION
Plaintiff-appellant Lone Star Steakhouse Saloon of Ohio, Inc. (Lone Star) appeals the decision of the Mahoning County Common Pleas Court granting summary judgment for defendants-appellees Ronald Quaranta, Joanne Quaranta, (Quarantas) and First American Title Insurance Company (First American). Lone Star raises two assignments of error. The first assignment of error pertains to the Quarantas and is based on contract. To resolve that question this court must determine whether a release of a covenant restricting land usage that is executed after a purchase agreement, but prior to the closing of the sale of the land, is a valid release of the covenant. To decide that question we must determine whether the covenant in question is a personal covenant (i.e. only between the parties to the covenant) or a real covenant (i.e. attaches to the land and restricts parties other than those who are parties to the original covenant). The second assignment of error is relevant to First American and is based on common law negligence, negligence per se, and breach of contract. To determine this issue, this court must decide whether First American is liable for failing to inform Lone Star that the restrictive covenant was released prior to closing. For the following reasons, the judgment of the trial court is affirmed as to First American and reversed as to Quarantas.
 STATEMENT OF FACTS
Earl Weaver owned a parcel of property in Boardman Township, Mahoning County, Ohio. In 1985, he divided the parcel of land into two parcels and sold each parcel. He conveyed Lot 1 to the Quarantas and Lot 2 to TW Properties (TW). TW is a partnership composed of Weaver, Jack Weaver, and Thomas Rochford.
Prior to conveying Lot 1 to the Quarantas, Weaver operated a restaurant on that lot known as "Some Where Else." The Quarantas purchased Lot 1 to open a restaurant. Mr. Quaranta wanted to ensure that Weaver would not open a restaurant on Lot 2 so he made it a condition of the sale for a restriction to be put into each deed.
The restriction was placed in the deed from Weaver to TW. The restriction stated that for fifteen years from the date of recording the deed that TW, their heirs, successors, and assigns could not open a sit-down restaurant or tavern on Lot 2 in competition with the restaurant on Lot 1. The restriction further stated that the restriction was for the benefit of Ronald L. Quaranta, his heirs and assigns and that if Lot 2 was sold these restrictions would be incorporated into the deed. The aforementioned restriction was to lapse on June 23, 2000.
The deed from Weaver to the Quarantas contains the following provision:
"Further granting unto the Grantees, their heirs and assigns, the rights in common with the Grantor in and to the restrictions contained in a prior deed from the Grantor herein to TW Properties, a partnership, conveying Lot Number 2 in said Bud Weaver Plat No. 1, as found recorded in Volume 82, page 324, Mahoning County Records of Deeds made among other purposes for the benefit of Lot Number One (1) herein conveyed, together with, but not limited to, the right to enforce said restrictions as fully and completely as the Grantor herein."
After the conveyance, the Quarantas opened a restaurant on Lot 1 known as "Isle of Capri." In 1994, the Quarantas sold the restaurant to Lone Star. In March of 1994, after the purchase agreement was executed but prior to the closing date, the Quarantas released the restrictive covenant from Lot 2. Their purported reason for doing so was that Weaver and Mr. Quaranta had discussed opening up a tavern on Lot 2 after the sale of Lot 1.
First American is the underwriter for Midland Title Security, Inc./Inter-County, Inc. (Midland). Lone Star hired Midland to act as escrow agent for the sale of Lot 1, to provide a commitment, and to issue an owner's policy of title insurance. First American/Midland issued a commitment for title insurance to Lone Star dated February 14, 1994. The commitment listed exceptions to coverage. One of the listed exceptions was the restriction found in the deed from Weaver to TW. On the date of closing, May 6, 1994, First American/Midland issued an Owner's Policy of Title Insurance. This policy also listed exceptions to coverage. The restriction found in the deed from Weaver to TW was again listed as an exception to coverage. However, the commitment showed that the covenant was still in full force.
On August 2, 1994, "The Office" (a tavern/restaurant) opened for business on Lot 2. Lone Star proceeded to open on August 10, 1994, without notice that the covenant was released. Lone Star did not inquire into the opening of The Office until October 2, 1998. On December 3, 1998, Lone Star allegedly first discovered that the covenant in question was released.
On April 26, 1999, Lone Star brought suit against the Quarantas and First American seeking declaratory judgment. All parties filed motions for summary judgment. The trial court granted the Quarantas' and First American's motion for summary judgment. This timely appeal followed.
 STANDARD OF REVIEW
An appellate court reviews a trial court's decision to grant summary judgment de novo. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102. Summary judgment is properly granted when: 1) no genuine issue as to any material fact exits; 2) the moving party is entitled to judgment as a matter of law; and 3) reasonable minds can only come to one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); Harless v. Willis Day WarehousingCo., Inc. (1978), 54 Ohio St.2d 64, 66. The evidence must be viewed in the light most favorable to the nonmoving party. Id.
Lone Star raises two assignments of error. The first of which contends:
 "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE QUARANTAS AND IN DENYING LONE STAR'S MOTION FOR SUMMARY JUDGMENT."
Lone Star raises several essentially similar issues under their first assignment of error, all based on breach of contract. Lone Star believes the covenant runs with the land and when Quarantas released the covenant in March 1994, equitable title had already transferred to Lone Star pursuant to their purchase agreement with the Quarantas that was executed on February 9, 1994. Therefore, Lone Star contends, the Quarantas were not authorized to release the covenant. The Quarantas argue that the covenant is a personal covenant on a lot in a general allotment and the covenant did not run with the land. Therefore, if Lone Star wanted the covenant to be part of the agreement with the Quarantas it should have specifically been included in the purchase contract.
The determination of whether the covenant runs with the land depends on whether the covenant is real or personal. A covenant is determined to run with the land when the liability to perform it or the right to take advantage of it passes to the assignee of the land. 35 Ohio Jurisprudence3d (1982) 341, Deeds, Section 110. A real covenant runs with the land; a personal covenant usually does not run with the land.
A real covenant has been characterized as relating to the realty, having for its object something annexed to, inherent in or connected with the land. 20 American Jurisprudence 2d (1995) 494, Covenants, Conditions, and Restrictions, Section 29. This covenant not only extends to heirs and personal representatives, but also to assignees. 35 OhioJurisprudence 3d (1982) 341, Deeds, Section 110. Real covenants are enforceable by all subsequent assignees of the original covenantee and against all grantees of the original covenantor. Uland v. S.E. JohnsonCo., Inc. (Mar. 13, 1998), Williams App. No. WM-97-005, unreported. An example of this type of covenant is the covenant of warranty against encumbrances. Id.
Conversely, a personal covenant usually binds only the covenantor personally. 35 Ohio Jurisprudence 3d (1982) 341, Deeds, Section 110. A covenant that does not run with the land is for the personal use and enjoyment of the land by the original parties to the covenant. Id. citing20 American Jurisprudence 2d (1995) 494, Covenants, Conditions, and Restrictions, Section 29; Uland, Williams App. No. WM-97-005. Personal covenants are enforceable between the original neighboring covenanting parties. Uland, Williams App. No. WM-97-005. An example of a personal covenant is an agreement between landowners of adjacent estates to restrict the use of one or both properties. Uland, Williams App. No. WM-97-005. If it is a personal covenant, Lone Star would only get the benefit of the covenant if it was incorporated into the purchase contract.
When determining whether a covenant runs with the land, the following three factors must be met: 1) intent for the restrictive covenant to run with the land; 2) the restrictive covenant touches and concerns the land; and 3) privity exists. LuMac Dev. Corp. v. Buck Point Ltd.Partnership (1988), 61 Ohio App.3d 558, 562. The element of intent is met if the original grantor and grantee at the time of the conveyance intended the covenant to run with the land. Id. The basic requirement of intent of the parties was set forth by the Ohio Supreme Court in 1859, by stating, "* * * whether it (a covenant) does so inhere (in the land) as to give a right and create an obligation in the case of assignees, we must look at the intent of the parties creating the estate. The law must say that it may inhere and the parties must say that it shall inhere."Peto v. Korach (1969), 17 Ohio App.2d 20, 23 citing Masury v. Southworth
(1859), 9 Ohio St. 340, 348.
Proof of intent can be determined from the language of the deed read as a whole. The Second and Third Appellate Districts have stated that the terms "successors" and "assigns" in the deed are evidence of intent for the covenant to run with the land. Siferd v. Stambor (1966),5 Ohio App.2d 79, 86-87; Meisse v. Family Recreation Club, Inc. (Feb. 20, 1998), Clark App. No. 97CA54, unreported. Although the use of such terminology as "personal representatives, assigns, heirs, or successors" is not essential to create a restrictive covenant which runs with the land, use of these words clearly reflects upon and is indicative of the intention of the parties at the time of conveyance. Siferd,5 Ohio App.2d at 86-87; Meisse, Clark App. No. 97-CA-54. However, if the parties do not intend for the covenant to run with the land, it will not run even if the nature and character of the covenant indicates that it could run with the land. Masury, 9 Ohio St. 340. The use of those words is not determinative of whether it was the intent of the parties that the covenant run with the land. Peto, 17 Ohio App.2d at 23.
The language in both deeds use the words "heirs" and "assigns" when referring to the Quarantas. The third paragraph of the deed from Weaver to TW states that the restrictions are for the benefit of "Ronald L. Quaranta, his heirs, and assigns." Furthermore, the original contract between TW and Quarantas contained language that the restrictions were intended to run with the land. This appears to indicate that there was intent for the covenant to run with the land and to benefit Quaranta, his heirs and assigns. Lone Star is considered an assign. Furthermore, Weaver and the Quarantas sought to release the covenant which would not be necessary if the covenant was personal in nature.
Since there is intent for the covenant to run with the land, the next element of a real covenant is whether the covenant touches and concerns the land. Touching or concerning the land is a determination of whether the property was made more useful or valuable by the covenant. LuMac,61 Ohio App.3d at 562. This covenant does touch and concern the land. It increases the value of Lot 1 because of the ability to be free from competition for fifteen years from the date of enactment. It also decreases the value of Lot 2. For fifteen years the price of Lot 2 would be decreased because of its limited use, thereby hindering the ability to sell or lease that land.
The third requirement is privity. Privity is a succession of interest or relationship. Metalworking Mach. Co., Inc. v. Fabco, Inc. (1984),17 Ohio App.3d 91, syllabus. One is in privity with another if he/she succeeds to an estate or an interest formerly held by the other. Id. at 92. Privity of the estate between the original grantor and subsequent grantees is generally required to enforce a restrictive covenant. Peto,17 Ohio App.2d at 24. Litigants in this action share the original covenantor as a common predecessor in title to their respective properties. LuMac, 61 Ohio App.3d at 564. Therefore, the requirement of privity is fulfilled.
In addition to the above three requirements, when a person or corporation is seeking to enjoin the other person from violating a restrictive covenant, as Lone Star is, a notice requirement is added.Schurenberg v. Butler Cty. Bd. of Elections (1992), 78 Ohio App.3d 773,777. The requisite notice can either be "actual notice" or "constructive notice" established by recordation of a prior instrument containing the restriction. Id. The restriction was recorded in the deed in 1985. Therefore, Lone Star had constructive notice.
Another way to determine notice and intent of a covenant is through a general scheme or plan for that parcel of land. Berger v. Van SweringenCo. (1966), 6 Ohio St.2d 100, 102. The development of a plan is essential when dealing with community subdivisions where the grantor imposes restrictions for the entire tract. Id. The Quarantas insist that this land is part of a general allotment and, as such, every deed had to contain the restrictions or there had to be a general plan filed with the deed. However, Weaver owned a parcel of land and split that parcel into two parts. This land is not considered a general allotment. Since it is not part of a tract development, evidence of a general scheme is not required. LuMac, 61 Ohio App.3d at 564.
Here, the covenant in question is a real covenant. Therefore, once the purchase contract was executed, equitable title vested to Lone Star and the Quarantas had no authority to release the covenant. Ohio has long recognized the doctrine of equitable conversion. Feiler v. Feiler
(1948), 149 Ohio St. 17, 27. Under the doctrine of equitable conversion, the seller becomes the owner of the money, and the buyer becomes the owner of the property. Wood v. Donohue (1999), 136 Ohio App.3d 336, 339. The one who is recognized in equity as owner of the property becomes the one with the real and beneficial use of title although bare legal title is vested in another. Id. at 340. Therefore, the Quarantas had no authority to release the covenant. The trial court erred by granting summary judgment in favor of the Quarantas. The judgment is reversed.
 ASSIGNMENT OF ERROR NO. TWO
Lone Star's second assignment of error contends:
 "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO FIRST AMERICAN."
Lone Star raises three issues under this assignment of error which are: common law negligence; negligence per se; and, breach of contract. These three issues will be dealt with separately.
COMMON LAW NEGLIGENCE
Lone Star claims that First American was negligent by failing to notify Lone Star of the release of the covenant. First American counters this argument by stating the contract extinguished Lone Star's ability to bring a negligence cause of action or in the alternative, the action is barred by the statute of limitations.
 CONTRACT BARS NEGLIGENCE CLAIM
First American claims the negligence claim is barred by section 15(b) of the policy which states: "(b) Any claim of loss or damage whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim shall be restricted to this policy." A title insurance policy is a contract between the insured and insurer. Chicago Title Ins. Co. v.Huntington Natl. Bank (1999), 87 Ohio St.3d 270, 273 citing Latina v.Woodpath Dev. Co. (1991), 57 Ohio St.3d 212. Construction of a title insurance policy is a matter of law. Chicago Title,87 Ohio St.3d at 273. Therefore, a court must look at the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy. Id. at 273, citing Alexander v.Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, syllabus.
The leading Ohio case is Chicago Title, in which the Supreme Court ruled that the language in that policy excluded the negligence claim.Chicago Title, 87 Ohio St.3d 270. In that case, the negligence claim was based on the failure to discover a superior mortgage. Id. at 273. The language of the insurance policy specifically excluded an independent tort action for negligence arising out of the status of a lien. Id.
The language of the policy in Chicago Title directly echoed the negligence claim asserted. That is not so in the case at bar. The clear language in section 15(b) does not preclude restrictions. Since the language in the policy and the claim are not as similar as they were inChicago Title, the policy does not bar a negligence suit. However, the negligence claim is barred by the statute of limitations.
 STATUTE OF LIMITATIONS ON NEGLIGENCE CLAIM
R.C. 2305.09 dictates that a four year statute of limitations applies to the tort claims in this case. The Ohio Supreme Court has stated that generally a cause of action accrues when the wrongful act was committed.O'Stricker v. Jim Walter Corp. (1983), 4 Ohio St.3d 84. Lone Star filed their cause of action on April 26, 1999. Therefore, any claim for negligence had to occur on or after April 26, 1995. First American issued the title insurance, which failed to inform Lone Star of the release of the covenant, on May 6, 1994. The Office opened on Lot 2 in violation of the covenant on August 2, 1994. Eight days later, on August 10, 1994, Lone Star opened. Regardless of what date you apply, the negligence claim is barred by the four year statute of limitations. It is clear that Lone Star's negligence claim did not fall within this four year period unless the discovery rule applies.
The discovery rule, R.C. 2305.09(D), applies when strict application of the general rule can lead to an unjust result. Harris v. Liston (1999),86 Ohio St.3d 203, 206. This statute tolls the statute of limitations until the discovery of the negligence. The statute of limitations commences to run when first discovered or through the exercise of reasonable diligence it should have been discovered. Id. at 207. Tort actions for injury or damage to real property are subject to the four year statute of limitations set forth in R.C. 2305.09(D). Id. at syllabus.
Lone Star urges this court to apply the discovery rule. Lone Star did not inquire into The Office opening until October 2, 1998. Lone Star did not discover the covenant was released until December 3, 1998. As such, Lone Star claims the statute did not run until that time.
The Ohio Supreme Court has applied the discovery rule in the situation for property damage from latent defects. Id. In Harris, there were claims of negligent construction and design of an adequate water-management system for a subdivision which resulted in property damage. Id. Latent defect is defined as, "A hidden or concealed defect. One which could not be discovered by reasonable or customary observation." Black's LawDictionary (6th Ed. 1991) 611. A restaurant opening on Lot 2 next to Lone Star is not a concealed defect. Lone Star merely had to look a few hundred feet across the parking lot to discover that a tavern/restaurant was located on Lot 2.
Recently we decided a case involving a claim of negligence/professional negligence for surveying a tract of land. Bell v. Holden (Sept. 29, 2000), Carroll App. No. 729, unreported. We did not apply the discovery rule. We held that surveyors were not professionals under R.C. 2305.11.Id. Instead the negligence claim fell under the mandates of R.C.2305.09(D), the same section that governs this case. The discovery rules adopted by the Supreme Court and the General Assembly for bodily injury claims brought under R.C. 2305.10, and the discovery rules determined inOliver v. Kaiser Community Health Found. (1983), 5 Ohio St.3d 111, andSkidmore Hall v. Rottman (1983), 5 Ohio St.3d 210 for medical and attorney malpractice claims arising under R.C. 2305.11(A), are not available to negligence claims brought under R.C. 2305.09(D). Bell, Carroll App. No. 729, citing Investors REIT One, 46 Ohio St.3d at 179. R.C. 2305.09(D) expressly includes its own limited discovery rule which states:
"If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered."
In accordance with our previous holding and the language in the statute, the discovery rule is not extended to general negligence claims. Id.; Investors REIT One v. Jacobs (1989), 46 Ohio St.3d 176,179-180. The statute of limitations bars Lone Star's negligence claim; this argument is without merit.
 NEGLIGENCE PER SE
Lone Star claims that First American breached its statutory duty set forth in R.C. 3953.07. First American argues that Lone Star did not raise this claim in their complaint, therefore this argument is barred. Lone Star did raise this claim to the trial court in their motion for summary judgment and First American objected stating that the proper place to raise this claim was in the complaint.
Civ.R. 8 requires notice pleading, not particularity pleadings. We have previously held that Civ.R. 8(A), (E) requires sufficient operative facts to be concisely set forth in a claim so as to give fair notice of the nature of the action. DeVore v. Mutual of Omaha Ins. Co. (1972),32 Ohio App.2d 36, 38. The complaint need not state with precision all elements that give rise to a legal basis for recovery as long as fair notice of the nature of the action is provided. Fancher v. Fancher
(1982), 8 Ohio App.3d 79, 83. The complaint must contain allegations from which an inference may fairly be drawn that evidences the material parts introduced at trial. Id.
The complaint clearly raises a negligence claim. Paragraphs thirty-eight through forty-one reference First American's failure to fulfill its duty and negligent failure to discover the released covenant. However, there is no reference to a statutory violation to raise suspicion of a negligence per se claim. Regardless, negligence and negligence per se are so closely intertwined that a separate pleading specifying a statute section is not required to comply with the notice pleading requirement. When a plaintiff raises a negligence claim, the defendant is on notice that negligence per se may be raised, regardless of whether the statute was listed in the complaint. Preparing for the two types of negligence claims does not require substantially more preparation.
Since a negligence per se claim was properly raised, the next question to answer is whether R.C. 3953.07 is a statute in which negligence perse is applicable. Through diligent research this court is unable to find a court in Ohio that has determined that R.C. 3953.07 is or is not a statute where negligence per se is applicable. In order for a statute to impose negligence per se, the statutory requirement must be stated with sufficient specificity. Sikora v. Wenzel (2000), 88 Ohio St.3d 493, 496. Where the legislative enactment imposes a specific duty for the safety of others, failure to perform that duty is negligence per se. Chambers v.St. Mary's School (1998), 82 Ohio St.3d 563, 565, citing Eisenhuth v.Moneyhon (1954), 161 Ohio St. 367. However, if the duty is only defined in abstract or general terms leaving to the jury the ascertainment and determination of reasonableness and correctness of the acts or conduct under the proven conditions and circumstances, negligence per se has no application. Hurst v. Ohio Dept. of Rehab. and Corr. (1995),72 Ohio St.3d 325, 327.
We hold that the negligence per se doctrine does not apply to R.C.3953.07. That statute states that, "No policy or contract of title insurance shall be written unless it is based upon a reasonable examination of the title * * *." Comparing this statute to other statutes that negligence per se applies to, R.C. 3953.07 does not set out a specific duty. For example, R.C. 5321.04(A) is a negligence per se
statute because it lists specific requirements that must be met in order to comply with the statute. It does not call for a blanket act of reasonableness. See R.C. 5321.04(A)(1)-(9) (requiring landlord to comply with all applicable housing health and safety codes, make all repairs, keep common areas in a safe condition, maintain good and safe working order and condition of all electrical, plumbing, sanitary, heating, ventilation and air conditioners, and supply running water.) Where the statute serves as a legislative declaration of the standard of care of a reasonably prudent person, the reasonable person standard is supplanted by a standard of care established by the legislature. Sikora,88 Ohio St.3d at 496, citing, 57 American Jurisprudence 2d (1989) 672, Negligence, Section 748. If this court replaces the standard in R.C.3953.07 for the reasonable person standard, the result is the same as what we started with, a reasonable person standard. R.C. 3953.07 demands that the title insurer make a reasonable examination, it does not specify what act is considered to be a reasonable examination. As such, negligence per se is inapplicable, and this argument is without merit.
 BREACH OF CONTRACT
Lone Star claims that the policy does not exclude liability for the restrictions. First American argues Schedule B, Exception 8, excludes contractual liability of the exclusion. As stated earlier, a title insurance policy is a contract between the insured and insurer and, as such, the construction of the contract is a matter of law. ChicagoTitle, 87 Ohio St.3d at 273. We must look to the plain and ordinary meaning of the language used in the policy unless another meaning is clear from the contents of the policy. Alexander, 53 Ohio St.2d 241.
The policy states the following on the first page:
 "SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITION AND STIPULATIONS, FIRST AMERICAN TITLE INSURANCE COMPANY * * * insures * * * against loss or damage * * * sustained or incurred by the insured by reason of:
 Title of the estate or interest described in Schedule A being vested other than as stated therein;
Any defect in or lien or encumbrance on the title;
Unmarketability of the title;
Lack of right of access to and from the land;
* *
Schedule B
Exceptions from Coverage
 Easement and Restrictions found in the Deed from Earl W. Weaver and Margaret Weaver, husband and wife to TW Properties * * *."
The plain meaning of this language clearly excludes coverage of the restriction. The policy provisions clearly states coverage is subject to the exclusions in Schedule B. Schedule B contains the restriction in the deed of Weaver to TW. Therefore, First American cannot be sued based on this provision. Issue three of the second assignment of error is without merit.
For the foregoing reasons, the decision of the trial court as to the Quarantas is reversed. The covenant runs with the land and equitable conversion prohibited Quarantas from releasing the covenant. As to First American, the decision of the trial court is hereby affirmed. The common law negligence claim is barred by the statute of limitations, the negligence per se claim is barred since the statute is inapplicable for a negligence per se cause of action, and the contract claim is barred by the language of the contract.
Donofrio, J., concurs.
DeGenaro, J., concurs.